All right. Our final case for oral argument today is 23-2338 In Re. McLeay. Mr. McLeay, please proceed. Thank you, Your Honor. Am I saying your name right, McLeay? You are, Your Honor. Thank you. May it please the Court, I'm Bart McLeay and I'm here representing the appellant, Dr. Matthew McLeay. This appeal involves...  I'm sorry? Any relation? He is actually my twin brother. Your Honor, if I could, I'd like to frame the legal issues here by telling you first what Dr. McLeay set out to do and what he thought it would work. This invention that we're talking about is a pharmaceutical drug. It was born in response to an unparalleled virus in recent history. Dr. McLeay knew a lot about RNA viruses, which includes the coronavirus, and he also knew a lot about ribavirin, an antiviral drug used for four decades. Dr. McLeay knew oral and intravenous use of ribavirin had safety issues, and he also... they had struggled... that drug had struggled to get the drug to the disease in that form. But ribavirin aerosol was safe. It was used with children, with RSV. But he knew that his peers may have doubts about the success of it because SARS included a protein called exonucleus, and that exonucleus could remove ribavirin in SARS. It doesn't exist in RSV, so while ribavirin aerosol worked there, they might suspect it wouldn't work here. But Dr. McLeay knew more than that because he knew that from data and information and from his own study in 30 years plus and working in pulmonary work, he knew that the exonucleus could be overwhelmed if there was a sufficient amount. He had been one of the co-authors of an article, Gilbert and McLeay. They had determined that when you used aerosolized ribavirin, you had multiple ways to get to the same location, but you could deliver a very significant amount of ribavirin. Do I remember correctly that amount was 10 percent? There was three different ways to get there, Yoni. 2 percent, 6 percent, and 10 percent were all three ways to get to about the same deposit in the lower airways. So either in the range that had been picked, there was a range for the use of ribavirin. Three different ways you could get that. How does that square with enablement of up to 50 percent? Up to, sorry? How does that square this Gilbert and McLeay, 2, 6, and 10 percent? How does that square with the enablement issue of up to 50 percent of ribavirin that's called for in Claim 20? Right. The way it would work this way, Your Honor, is first of all, is ribavirin and water put together, obviously, and then it's going to be inhaled, so it has to be aerosolized, and then it has to run through a nebulizer. So all parts of what I just said are part of the claim, part of Claim 20.  So when we start with 49 percent ribavirin at that level, you're going to evaluate how much water would be combined to be aerosolized and then to be inhaled and then put through a nebulizer, and it's going to change. There could be some inoperable embodiments, as this Court uses in United Therapeutics, or some refinements that might need to be made. We're talking about, this isn't a genus claim where we're looking at whether or not there's a full scope of multiple different types of antibodies or other proteins that might be there. This is a single claim, ribavirin and water used together to be aerosolized, inhaled, and pushed through a nebulizer. It turns out that Gilbert and McClay identifies three ways, 2 percent, 6 percent, 10 percent, but there could be new nebulizers in the future. There are ultrasonic nebulizers that I understand that are out there that may allow for a greater or higher level. The point of the percentage was not to say this is the precise amount, but what it was to say is that there's going to be a ribavirin-water combination that's going to have to have more water than ribavirin, and then it's going to have to be used during this process. The entire claim has to be considered from our standpoint, and that includes making it aerosolized and allowing for inhalation. I'm just having trouble with seeing that the prior art, the 2, 6, and 10 percent, is a long way away for less than 50 percent ribavirin and more than 50 percent water. I mean, we adopt claims with the PTO issues claims because there's a specific way to do something that achieves a specific result. Now, that doesn't mean within those parameters that's the only way it can possibly ever be done, but this seems so broad between 0 and up to 49.999 percent ribavirin and 50-plus-anything percent water that it leaves such a gap between what has ever been done in the past and what might be done in the future that I don't know how you get to a level where you can say this is fully enabled. Your Honor, I would say that fully enablement obviously comes down to the inventor being able to, I'm sorry, a faucet or a person skilled in the art making and using the invention. We're talking about pulmonitis and infectious disease specialists, and here's what they're going to do. I mean, they're using it without undue experimentation. Yeah, and there would be no undue experimentation here, Your Honor, and here's why. They have to, you can't, respectfully, we can't just use one of the claims. The person skilled in the art is going to do this. They're going to look up, they're going to see that the specification claim says ribavirin and water, it's got to be aerosolized, it's got to be used for inhalation, and it's got to get through a nebulizer. They all know what those parameters are. These are things that a person skilled in the art would understand how to do it. There have been cases that talk about nebulizer dosage. I guess that language could have been used here, but it was simply to say there is water and ribavirin are going to be mixed, and that composition is then going to have to be used in this way. I don't think you can talk about one set of the claims and then ignore the rest of the claim and say there's no enablement. I understand there's a... Well, one evidence is that a skilled artisan would know how to figure out what the percentages are if beyond 2, 6, and 10 percent. I mean, you've got up to 50, and you have, you know, six or seven articles cited in the spec about how nobody thought that ribavirin would work to treat COVID, and you have no examples at all in the spec of it being used to treat COVID. And so what, I mean, how is a skilled artisan, what evidence is there, a skilled artisan would know what things within the range without undue experimentation up to 50 percent are going to work? Sure. The way the skilled artisan would do this process is the way probably the post-filing reference macina did it, and that was that they would look at, there has to be a ribavirin water combination, and that combination then has to be used with a nebulizer. They would look to the prior art, and if you even Googled this, ribavirin aerosol with nebulizer for SARS-CoV-2, you would come up, you would almost for sure come up and see the Gilbert and McClay prior art, and that prior art is what then teaches that 2 percent, 6 percent, and 10 percent will get you. It's one way to get you. That's one way to get you for influenza. Pardon me? For influenza, right? That's, I mean, just to be clear, that is, that article is directed to influenza, right? Yeah, the article has the title influenza on it, but the article actually is just about delivery of drugs. But it doesn't say, I understand. And it also talks about, well, the delivery of drugs. Wait, please don't interrupt me. No, I'm sorry. I just have a really simple question. Okay, sure. When I read the article, it didn't say anything about COVID. Am I wrong? No, you're not. Okay. It didn't say anything about COVID, but it also talked about RSV. It talked about the parameters in the table which were there were for use of different types of viruses, and so when a person skilled in the art would be looking, they would look to those parameters in the table, and they would say, here's three different ways to get to the same result. It didn't have anything to do with what was at the bottom of the line. I have a different concern, though. Okay. Let me ask mine, because this is the time we have for you to assuage me of my concerns I have. So this is my concern. My concern is that cases like Rasmussen, where we kind of somehow get utility somehow involved with enablement, and there's evidence from which a patent examiner could determine that the invention will not work for it to treat as recited in the claim. And there's in that circumstance where the PTO says, we see a person of ordinary skill in the art would not know that this would work, and you haven't shown how it would work, and that is sufficient for enablement in Rasmussen. Why isn't that something that applies here?  Thank you for your question, Nora. First of all, as to it not working, the examiner here, and then the board picked up on several of the articles, the references, they were all about oral and intravenous not working. The Tong article, Appendix 400. Liu article, 386. Barnard article, Appendix 415. These were all about oral and intravenous use not working. And these were all in the application itself. Yes, and they were referenced in the specifications, yes. In the specification. And the specification characterizes them, right? Yeah, it characterizes. They say it's use, ribovirin's use in treating COVID-19 is not expected by skilled pulmonologists and infectious disease specialists to be successful in treating COVID-19. That sentence doesn't have all these limitations that you're now imparting in it, right? Well, the actual references themselves, which are also in the appendix, do have, indicate that they were for oral and intravenous. The article from Farron, which is in Specification Paragraph 9, that talked about the exonucleus, and that that has nothing to do with a safety issue, which is what some of those oral and intravenous uses cases do have. This had just simply a utility. Could it remove it or could it not? In the section of your specification, in the written description, maybe the preferred embodiment of the invention, is there some sentence or something that says, we discovered that with respect to a nebulizer or that this ribovirin is effective and will work? I mean, where is that? Paragraph 14 of the specification says that this drug will be used, that will reduce. The discovery here was that- Did you say Paragraph 14? 14, yes, Your Honor. It says, in fact, that the drug will use, it was a surprising discovery, and that it will result in two things. Reduction of the viral load of SARS-CoV-2, and second, that it would also reduce or prevent SARS. So it's directly telling the person skilled in the art, yes, there is this background, there is these discouraging remarks, there is these negative histories, but there is- So I'm to read this language about delivered to the lungs of the COVID-19 infected patient, that that means it's an aerosol? Well, it is referenced elsewhere in the claim, of course, that this is a ribovirin aerosol. I mean, Paragraph 14 doesn't say it. Paragraph 14 may not say it, but the specifications as a whole, I think, would indicate that this was relating to the aerosol ribovirin delivery. And it says, there's a surprising discovery that any one of ribovirin, and that several other drugs, or any combination thereof, would be effective. Well, there was some characteristics that were similar between them, but today we're here on Claim 20, and ribovirin specifically. But I do want to answer you on Rasmussen. Where does it say in the specification that the reason why this is effective is because the exonuclease would be overwhelmed by using an aerosol with a large amount of ribovirin? Does it say that? It doesn't say it specifically, Your Honor. It's implied by reference reading. Again, reading as a whole is what we would tell you. And also then, of course, reading the claim along with the prior art from Gilbert and McClay, which shows it overwhelmed. But I want to address Rasmussen. Rasmussen, of course, was about a drug, finasteride, I believe, that was being promoted for some type of cancer. I think it was colon cancer or prostate cancer. And the court there said, in support of the Board, there was no evidence that this drug has any relationship to prostate cancer. There was no evidence in the prior art at all. And it went on to say, and there was no data, no information to suggest that. And so it was those two things together, the prior art and the fact that there was no data on it, that prevented that, that said, the court said, you know, there's no shown utility here. This, we can't see it at all. But in the case of Grunenthal, the opposite was true. There was some prior art that suggested a relationship between the drug and the disease. And this court did not require any testing or experiments or anything at all and said that because of that relationship and because there was pharmacological activity that would be generated, that was enough to withstand the practical utility prong of Section 101. I hear you. Well, let me ask you this question. In a circumstance where I am supposed to review underlying fact findings for substantial evidence, how do I distinguish this case from Rasmussen? Because I feel like maybe you're asking me to reweigh the fact findings made by the PTO. You know, with the finding, for example, that a person of ordinary skill in the art wouldn't think it would work. Well, the fact finding, the factors that were identified by the board here were just a few. There was, you know, there was eight one factors, and they identified just a couple. One of them was that the art was unpredictable, which, from our perspective, it's not when you take the specification as a whole and you say there's going to be in the claim together with the prior art, you have an aerosolized ribavirin that's going to be working with a deep deposit into the lung. There's a procedure that had been identified prior to 2008. We're looking at some references to show its danger, but Gilbert and McClay specifically found in that article, and there are others, that says aerosolized ribavirin does not suffer from the same problems of oral and intravenous ribavirin. And the skilled person in the art would find that, and they would reconcile those ideas and understand that, of course, aerosolized ribavirin has been used for decades with children. And so that would not be a fair, you know, so aerosolized ribavirin is different, and maybe Dr. McClay. So you're distinguishing Rasmussen with unpredictability of the prior art. Well, and also the only other ground that they really talked about there was, let's see, what was it? It was, one second. Okay, we're well into, all your time, all your rebuttal time. I'll restore some rebuttal time, but let's hear from the government. Okay, thank you, Your Honor. Good morning, Your Honors, and may it please the Court. The Board correctly found Representative Claim 20 not enabled. McClay's application with multiple citations says at the time of filing, a person of ordinary skill in the art would not have expected ribavirin to be successful in treating COVID-19. And I'll note that statement did not distinguish between oral IV versus inhalation, and that the skilled pulmonologist, who is someone who would know about aerosolizing a drug, would not expect the drug ribavirin to have worked in COVID-19. McClay's specification then admittedly puts out a hypothesis that ribavirin would be successful in treating COVID-19, but provides no data, experimental, analytical, or otherwise, that has any efficacy or use against SARS-CoV-2. So the Board's decision should be preferred. Yeah, my problem with that is that, I mean, I feel like it's to some extent flipping the burden on its head. They've put forward a claim that says that this is effective. Suppose that instead of up to 50 percent, it said 2 percent. At 2 percent, suppose there were a claim 2 percent, 6 percent, and 10 percent effectiveness. And it turns out it is effective, right? Maybe they didn't know that at the time, but it does turn out that it works. So what's the problem with that? I mean, make and use for its intended purpose, suppose it was a very specific claim, not up to 50 percent, so we're not talking about a range, but here is a specific, concrete, narrow composition to be used in a method of treatment. I mean, because one of my problems with Rasmussen is it says, and then choose a therapeutically effective amount, right? What does that even mean? But here we've got a nebulizer, we've got aerosol, we've got combining the active ingredient with water. We have a lot of specificity around the method of treatment here that didn't exist in Rasmussen, and it works. So what happens now? I mean, I think I see the difference in those facts. It's just the problem is all that enablement, getting the specific amount and using the nebulizer with the ribavirin to treat COVID-19. At the time of filing, no one thought it would work. And those are persons of skill in the art who know about Gilbert and Maclay's prior art, who know that it's cesspillage treating. But it doesn't matter if no one thought it would work. If without undue experimentation, they could figure out it did. And here, if the claim, especially if it was limited the way I said, 2%, right? I want to stick with my hypothetical. I don't think Rasmussen applies because I think that it doesn't matter. I mean, every invention has to be non-obvious, right? So in order to have a claim, it's got to be non-obvious, which means by definition, people in the skilled art didn't necessarily think of it before or think it would work necessarily. And that's why you invented something. So if it's very specific, and by the way, I'll also add this. This is an originally filed claim. This isn't a continuation with a later filed claim. So it is possible for claims to be self-enabling because they're part of the specification. So, I mean, and when I say it's an originally filed claim, for my own clarification purposes, for the record, I'll say it was a dependent claim that was turned into an independent claim. So it's not originally filed identically word for word, but all of the relevant limitations were present in the way it was filed originally. I think the problem, even if the claim is to, let's say, a 1% use of liquid ribavirin, is there's nothing in this specification that actually says that shows that ribavirin has any utility against COVID-19. But who cares? Doesn't undue experimentation kick in? But this court's, Rasmussen's, and also 318 patent litigation after Rasmussen says that there has to be some showing of use in order for you to be able to make and use an invention. And if there's no shown utility, then you can't have shown someone how to make and use the invention. Okay, suppose that this inventor actually did use it at 2% and it helped, you know, 100 people, but he didn't put all that in the spec at the time. He didn't put it in the spec. He just put the claim in the spec. Oh, my gosh. I have this great invention. I know people said it wouldn't work, but it does. Use it here. Use it at this particular level. So if you had that post-filing information and said, look, in fact, my 2% aerosolized ribavirin works, and you would present that evidence to the board, that could show that there was enablement at the time of those claims.  Because enablement is from the vantage point of a skilled artisan. I said it could. I thought it could show that it was enabled, as long as it shows enablement at the time of filing. Why do we inject utility into enablement? Why is that? Because utility usually falls under 101, right? So I'm also struggling with, you know, I know we did it in Rasmussen, but maybe it made more sense there. But why is it that, as a policy matter, we should say, you know, we're going to treat the PTO like the FDA, and you need to have, in some circumstances, where a person of ordinary skill in the art wouldn't think the invention might work, you're going to have to actually prove it. I mean, I would push back a little. We're not requiring utility to the level of safety and efficacy that you've shown it works in people. In vitro and in vivo animal studies can show utility under this court's case law. So there's no requirement to show safety and efficacy. But you think they have to do something? You think they have to show, in their specifications, some actual experiments? No, they have to show some use. And so I'm just going to get back to Judge Solis and why we put 101 in it. The use they've shown is using this aerosol. Let's, again, assume it's just, well, let's forget about the up to 50% issue. But the claim itself says using this inhaler, using it as an aerosol to treat COVID, right? And I think we can all agree that a person of ordinary skill in the art could make that happen, right? Could do those steps, yes. But the only question is whether it has utility, whether it actually would treat someone with COVID. Right. And why should that be an enablement issue? As this court said in Rasmussen and in 318 patent litigation, in order to show so that you can make and use an invention, there has to be a use. And that's what incorporates utility into the enablement standard as a matter of law. And so the PTO following that case law, examiners cited 318 patent litigation, the board cited Rasmussen, that there's no data or analytical reasoning to connect. This is why I think the PTO has gone way too far. There has to be data or analytical reasoning if the claim is, in fact, self-enabling and very precise. The good argument you have with me is that 50%, who knows where in that 50%? That's why I don't want to touch that argument, because I think that the PTO is consistently, over broadly using 318 and Rasmussen, and I'm bothered by it. Because I think you suddenly think you're the FDA, and you're not the FDA. And I don't think they had to prove anything. I don't think they had to put it in their spec. I think they just have to teach someone how to make and use it. And I look at Rasmussen and those claims, and I don't think they teach someone how to make and use it because they say, go use a therapeutically effective amount. Well, that is just, you know, that's like, go find something that cures it. Like, that doesn't, you know, that isn't precise. And so I think that there's no utility because nobody knew how to get to a therapeutically effective amount in that case. So I think that those cases, while they use the word utility, they're still tethering that word to somebody being able to make and use without undue experimentation. Use without undue experimentation, because a therapeutically effective amount has no constraints around it. And you might have that same argument here on the 50%. So don't think I'm not aware of that. But what I'm bothered by is this notion that there needs to be some degree of proof that they have actually used. Constructive reduction of practice is not necessary in patent law. And so I just, I'm really bothered by the idea that they had to show in vivo or in vitro or in human or anything else. I don't think that's necessary. And I think what you heard counsel say today about the reasoning about how the endonuclease would be overwhelmed if you put it in a nebulizer and got it to the lungs, would be some reasoning over the prior art as to why it would have that use. And that would be sufficient if it were in the specification. And as this court said in Genendik v. Novo Nordis, you can't enable a claim by showing no, teaching no procedure for how to do it and then just say it's in the prior art. What's novel about this claim is that they discovered they could use it with SARS-CoV-2. That's what's supposed to be novel. But that's, they didn't even put, use the Gilbert-McClay method in their specification. They're just saying it's somewhere out there in the prior art. It's enabled because people still know. But they did claim it. You say they didn't put, use this method in the specification. But they did put the method in the claim, originally filed claim, right? It's the claim that's currently before. Yeah, that's right. Claim 20. I mean, it doesn't have, it doesn't. Claim 20. Right. So I'm just saying that that undermines your point, I think. Because they didn't have to say, use the technique of the prior art. They could just say, here, here, we're claiming it, right? It's part of the original written description. So are you saying that the disparity between the specification and the claim and the coronavirus or whatever it is here and the COVID-19 there, that the absence of alignment or connection is an important part of your case as to why there's no enablement? I mean, it's the connection between the prior art is teaching using this method with influenza A, and which the board found didn't correlate with. I think the 800-pound gorilla is up to 50% that everybody needs to talk around. And we're talking around all the other things, too. But as long as we're doing that, I'm trying to figure how important to you is the differences or the lack of congruity between the spec and the claim language itself. I mean, the claim language as an original claim is part of the spec. I think the claim just says treating using this aerosolized ribavirin and the large percentage. And we could definitely talk about the large percentage because the board found it wasn't a measurement scope. Can I ask you a quick question first before you do that, which is do you agree that our case law says that you don't need to have data in your specification? Yes, you could have the analytical reasoning. So if the reasoning that counsel has put in the blue brief and presented to you today is like how you get from what they knew in the prior art and why they had failed to treat coronaviruses and SARS-CoV-2 specifically, if they had put in the specification all that reasoning, well, now that you should use the nebulizer because that's what's going to get into the lungs and that's what's going to overwhelm the endonuclease. But why did they have to explain that? If the nebulizer was the big difference, right? If all of the prior art, even though they don't say it, was doing it intravenously, in the claim, which is part of the original specification, they're expressly saying do this with a nebulizer. They're not claiming using ribo-whatever-it-is in any form. They're saying just only with a nebulizer at this concentration. Why isn't that enough? I think the... So substantial evidence that the art was so unpredictable that pulmonologists didn't think it would work. They advised against using ribavirin. And there was no argument before the board that it was the inhalation versus the oral and the IV version that made the difference. So substantial evidence presented to the board was that pulmonologists didn't think it would work regardless of the administration. And all they're saying is... Do you think undue experimentation has no role to play in assessing the utility? I mean, the utility is some use for it. Here, they're also undue experimentation because if you haven't shown a use for it, one of skill and the art doesn't even know where to start in terms of... No, that's not true because this claim is really specific. Nebulizer, 50%, water. So you can't say one of skill and the art doesn't know where to start. Now, you could say one of skill and the art doesn't know where to start in the range of 0% to 50%. But again, I'm trying to put that to the side because I have a problem with what the PTO is doing with this utility requirement enablement in general. So let's stick with suppose the claim was 2%, right? You can't say one didn't know where to start because that would be an incredibly precise, very narrowly defined thing. So are you saying undue experimentation has no role to play in utility? Because I don't see what undue experimentation there would be in this claim if it was directed to 2%. I think then it would just be the utility, the undue experimentation... I mean, for doing a 2%. I'm not sure. You don't have an answer. I'm not sure. You don't have an answer. The board was relying on the fact that one of skill and the art didn't think it would work. Yeah, but that's what I'm saying. I think the board has dropped undue experimentation from that analysis and it's wrong to do so. I think that the board needs to remember that enablement without undue experimentation is an always factor. And this little weird utility nub on enablement is not independent of the undue experimentation concept. I mean, it's hard to see how 318 patent litigation and Rasmus' joke are requiring undue experimentation. I mean, you can tie it to the therapeutically effective, but I think one of the claims was just to treating Alzheimer's in the 318, not necessarily finding a therapeutic amount for a dose. And in that case, the court did look to the fact that there was no known use for I think I can't remember the specific name of the drug in treating Alzheimer's disease.  The one problem I have is in 318, I have to go back and look, but my best recollection is they weren't originally filed claims. It makes a big difference. Not part of the spec. I mean, I think it doesn't fare well. Not positive, but that would make a big difference. I'm not sure how that makes a difference, though, because it still is what 318 and the point of Rasmuson and 318 is, that someone's not just throwing out hypotheticals. And my clerk also said, by the way, actually 318 does use therapeutically effective amount in all the claims. Okay, it does. So, yes, it's consistent with Rasmuson. I mean, I think both of those cases will characterize it as a treatment claim, not specifically looking at the therapeutically effective. And here also is the treating claim. But, again, the last point I'll make is this is the 50%, and they have not enabled the full scope of that claim. That's what the board found, and they didn't even appeal that. So, please ask the court to affirm the board's decision. Thank you, Your Honor. Thank you for your argument. All right. Mr. McClay, you have some. We'll give you two minutes for rebuttal time. Thank you, Your Honor. I want to address the breadth of the claim up front. I think it's notable that Juan's factor has breadth of the claim as factor number eight. That factor was not used. It was not cited by the board, by the examiner, or anybody. And I think what they're trying to do here, as a matter of fact, is make a written description argument. They're saying that that claim range is such that maybe the inventor didn't know what they had invented, didn't have possession of the invention. What this argument they're making is, in effect, a disguised written description argument. I also want to mention that the words, full scope of the claim, that's been used by Amgen and this court many times, that is not the same thing as the full range of a claim. A full scope of the claim has been used multiple times in the case law, referring to genus claims. And that makes a lot of sense. When it's a range of a claim, like you did in United Therapeutics, there could be inoperable embodiments within the claim. There was a whole group of patients in United Therapeutics that wasn't even covered at all by the claim. And the court said, look, there's refinements that can be made. There's inoperable embodiments that can be restricted. And all of those things can take place. So I would also know that Messina, who was the post-filing reference, did exactly this. Dr. McClay did not need to be standing next to any pulmonologist or infectious disease person and say, hey, look, this is how you identify SARS-CoV-2. Here's how you use a nebulizer. Here are the limits of the nebulizer. Here's what you have to do. None of those things would have to be taught to that. This case largely turns on the knowledge and ability of the person skilled in the art. And they would have all the information. In fact, United Therapeutics says exactly that. And I almost want to see if I could quote it. But aren't written description and enablement the twin brothers? They're different, but they're very, very close, and they're very, very connected. I mean, how do you jump from one to the other? I'm sorry, between the two. To me, written description and enablement are like you and Dr. McClay, twin brothers. They're very closely related. And the line between them is sometimes hard to distinguish. And to come up here and say, no, this is really a hidden written description argument, it doesn't have anything to do with enablement. Fair comment. Not disingenuous, but. Judge Giltrap, fair comment on one point. But the fact is that this circuit has said repeatedly that written description and enablement are separate concepts and they need to be dealt with separately, and has said that over and over. I just want to mention one thing. This is what United Therapeutics said. It said there, a person skilled in the art would have, and I'm quoting now, information to limit the claims to operative embodiments and refinements without undue experimentation, then it is fully enabled. So a pulmonologist, an infectious disease person, knows how to use a nebulizer, knows they have limits, would take ribavirin and water at some level. They know they have to have more water than ribavirin, and they're going to find a composition that works to get it through the nebulizer. All they really had to do was to go to Gilbert and McClay and find three different ways they could get to the same deposit, 2, 6, and 10 percent. But there may be other ways. They didn't want to say there's no other nebulizer that could put more than 10 percent in. Dr. McClay knew that it might be more. It could be a new nebulizer, an ultrasonic nebulizer, a jet nebulizer. Okay, okay, okay. You got me. All right. Thank both counsel. Case is taken under submission. Thank you.